Elsye K. Leiser and Herman Leiser v. Commissioner.
Elsye v. Commissioner
Docket Nos. 24216, 24217.
United States Tax Court
1952 Tax Ct. Memo LEXIS 89; 11 T.C.M. (CCH) 932; T.C.M. (RIA) 52276; September 11, 1952
*89 Upon the record, held, that the petitioners did not receive income consisting of alleged black market commissions in the amount of $72,370, or any part thereof; and that the respondent failed to prove by clear and convincing evidence that the petitioner, Herman Leiser, understated his income with fraudulent intent to evade tax. Milton H. Schmidt, Esq., 809 Atlas Bldg., Cincinnati 2, Ohio, for the petitioners. F. S. Gettle, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent has determined deficiencies for the year 1943 as follows: Income
and Vic-
Sec. 293(b)
Docket No.
tory Taxes
50% Penalty
24216 Elsye K. Leiser
$26,637.62
24217 Herman Leiser
26,737.62
$13,368.81
The petitioners filed separate income tax returns for *90 1943 on a community property basis. They filed their returns with the collector for the district of Louisiana. The Commissioner has determined that the petitioner, Herman Leiser, received payments in 1943 aggregating $72,370; that these alleged payments were not included in gross income in the returns of the petitioners; and that the deficiency in tax of Herman Leiser resulting from his failure to report the alleged payments is due to fraud with intent to evade tax. Under section 293(b) of the Code, the respondent has added the 50 percent fraud penalty to the deficiency of Herman Leiser, Docket No. 24217. In the proceeding of Elyse K. Leiser, Docket No. 24216, the deficiency results from the respondent's inclusion of $72,370 in the community income. The only questions presented for decision are whether any part of the deficiencies is due to fraud with intent to evade tax, and whether Herman Leiser, in fact, received payments totalling $72,370, or any part thereof. Findings of Fact The petitioners are husband and wife, and they are residents of New Orleans, Louisiana. The issues to be decided relate only to the petitioner, Herman Leiser, and he is referred to hereinafter as *91 the petitioner. During 1943 and for twenty-five years prior thereto, Herman Leiser was engaged in the business of distiller's sales agent, and he represented various distillers and liquor brokers. He took orders from and made sales to wholesale liquor dealers and jobbers located principally throughout the southern part of the United States. He was, in 1943, self-employed, and his income in 1943 was derived from commissions earned as a distiller's sales agent. He paid all of his business expenses out of his fees. The source of his commissions was principally from the firms he represented, but during 1943 he received commissions, or "finder's fees" from the purchasers. The chief firms which he represented in 1943 were Old Springs Distillery Company, Harmar Company and Samuel Freedman Company, whiskey brokers and part owners of a distillery in Wilder, Kentucky, called Pebbleford Distillery Company. These firms were located in or near Cincinnati, Ohio. During 1943, the rate of the commission which the petitioner was entitled to receive, and did receive, for cases of whiskey and ordinary liquor was one dollar per case. For other liquors, the standard commission ranged from 50 cents *92 a case on some kinds of liquor, to $7.50 per case on champagne and other special items. The petitioner has been a resident of Louisiana since 1917. Before then, he lived in Houston, Texas. In 1943, he was about 58 years of age. He was 65 years old at the time of the trial of this proceeding. Although the petitioner maintained his permanent residence in New Orleans, he spent, in 1943, from 80 to 90 percent of his time in Cincinnati, Ohio, which was the center of the so-called whiskey section. There were shortages of whiskey and other liquors in 1943, so that those seeking to make purchases went to Cincinnati in search of supplies. The petitioner, like other salesmen, made his headquarters in Cincinnati in 1943 because it was the sales center. When he was in Cincinnati, the petitioner lived at the Gibson Hotel. Leiser maintained books of account during 1943, as was his custom. His accounting records were simple but, also, they were adequate records of his business transactions, his receipts, and his expenses. He employed on a part time basis a bookkeeper, Mrs. Delores Rouen, whose principal employment was that of bookkeeper for Harmar Company, in Cincinnati, which was one of the *93 firms the petitioner represented and with whom he did a substantial amount of business. The petitioner gave Mrs. Rouen the information from which she made entries in his books of account. She made entries in the books of account of the amounts of the petitioner's commissions, the firm or person from whom payment of a commission was received, and usually the quantity of merchandise sold for which the commission was paid. The petitioner sometimes advised his bookkeeper of the rate at which the commission was paid, but at times he did not. No book entries of commissions were made until the petitioner received payment of commissions. Petitioner maintained two checking accounts, one in the Whitney National Bank in New Orleans, and one in the Fifth-Third Union Trust Company in Cincinnati. Also, petitioner rented a safety deposit box at each bank. The income tax returns of both Mr. and Mrs. Leiser were prepared by Richard Harang, an accountant having offices in New Orleans. Harang used the above described accounting records of the petitioner in the preparation of the returns. After the returns for the year 1943 of Mr. and Mrs. Leiser were filed with the Collector of Internal Revenue in *94 New Orleans in 1944, Leiser discovered that he had omitted an item of income in the amount of $4,538, and he advised Harang of this omission. Thereafter, in June 1944, amended returns including this item were filed for each of the petitioners. Subsequently, it was discovered that commissions in the amounts of $386.42 and $1,786.96, deposited in Leiser's accounts in the Whitney National Bank and the Fifth-Third Union Trust Company, respectively, had been inadvertently omitted from petitioners' returns for 1943. Leiser frankly admitted his tax liability on these items of income and explained that he had either forgotten to call them to Mrs. Rouen's attention, or she had neglected to make the entries in Leiser's books after receiving the data from him. Prior to the prohibition ear Leiser became acquainted, through his father-in-law, with Captain Tom M. Morrissey. Following Repeal, Leiser renewed his acquaintance with Captain Morrissey, who had gone into the wholesale liquor business at Delta Point, Louisiana, and did business under the firm name of Morrissey Liquor Dealers. Leiser made substantial sales to Morrissey Liquor Dealers during the years that followed. A firm friendship developed *95 between Leiser and Captain Morrissey on both a business and social basis. For the greater part of the year 1940 Leiser was incapacitated as the result of a heart attack. Captain Morrissey placed large and frequent orders with Leiser during his illness without any solicitation from him. From 1936 until October, 1938, Morrissey Liquor Dealers employed Steve Castleman. One of Castleman's principal duties was to assist in the purchase of liquor. Castleman frequently placed orders of Morrissey Liquor Dealers with Leiser. In October, 1938, Castleman left Morrissey Liquor Dealers and operated a business known as Delta Distributing Company in Vicksburg, Mississippi. Thereafter, Castleman continued to make purchases of liquor from Leiser on behalf of Morrissey Liquor Dealers through the year 1943. He was frequently at the place of business of Morrissey Liquor Dealers when Leiser was there transacting business, and he frequently negotiated orders on behalf of Morrissey Liquor Dealers. Mike Morrissey, a son of Captain Tom Morrissey, was associated with Castleman in the operation of Delta Distributing Company. They were partners. Mike Morrissey had a 75 percent interest in the business, and *96 Castleman had a 25 percent interest. The business from its inception until it was liquidated on June 30, 1944, was operated in violation of the laws of the State of Mississippi, which prohibited any commercial traffic whatsoever in alcoholic beverages, and also in violation of the laws of the Federal government, since no basic permit was ever obtained as is required by section 3 of the Federal Alcohol Administration Act of 1935, 49 Stat. 977, 27 U.S.C. § 203. Captain Tom Morrissey died in 1943, and the business of Morrissey Liquor Dealers was carried on thereafter by his widow. From October 1, 1942 to June 30, 1944, Delta Distributing Company made gross sales of liquor in the approximate sum of $2,500,000.00. Of this amount, $249,366.40 represented money collected in sales of liquor which were made at prices in excess of the permissible O.P.A. ceiling prices and, consequently, such sales constituted violations of Federal laws. Moreover, no part of this latter sum was included in the amount of the gross receipts of the business which was reported in the tax returns filed by either Mike Morrissey or Castleman for the years 1943 and 1944. The position taken *97 by both Castleman and Setaro, his accountant, was that it was unnecessary to include in gross income black market "premiums" or the overceiling mark-ups collected, since an identical amount was alleged to have been paid out by Delta to its suppliers, thus constituting a "wash," or off-set against the amounts charged by Delta over and above O.P.A. ceiling prices. In spite of the fact that the partnership interests of Morrissey and Castleman were 75 percent and 25 percent, respectively, the entire net income of the business of Delta was reported by Castleman. The Commissioner determined deficiencies and fraud penalties against Morrissey for the years 1938 through 1943, based on his failure to include in his individual returns for those years his proportionate shares in the net income of Delta Distributing Company. The Commissioner has settled the government's claim against Morrissey by means of a series of stipulations which provide that for the years 1938, 1939 and 1940, no deficiency or penalty is due from Morrissey, and that for the years 1941, 1942, and 1943, an aggregate deficiency of $79,892.17, and an aggregate penalty of $32,132.25 is due. Also, as part of the settlement, *98 Steve Castleman, who had filed, in a United States District Court, a suit against the Commissioner for refunds of taxes alleged to have been overpaid by him, has stipulated that his action was to be dismissed with prejudice, and that the Commissioner was to apply against the redetermined tax liability of Mike Morrissey (as summarized above), all refunds to which he, Castleman, would otherwise be entitled as a result of his having reported income over and above the share of the net income of Delta Distributing Company to which he was actually entitled pursuant to the true partnership arangement. [1]
Castleman has never been prosecuted for any of the various violations of Federal or State statutes referred to above. In the year 1943, as the result of negotiations entered into between Steve Castleman, acting on behalf of Morrissey Liquor Dealers, and petitioner, as salesman *99 for Pebbleford Distillery Company, there was sold and shipped to Morrissey Liquor Dealers at Delta Point, Louisiana, the following stocks of liquor: Purchase
Date
Quantity & Brand
Price
August 14, 1943
400 cases Pebbleford, 5 year Bond
$13,600.00
November 15, 1943
750 cases Pebbleford Bourbon, 5 year Bond
25,487.00
(2 invoices)
December 14, 1943
1160 cases Pebbleford, 5 year Bond
39,240.00
July 30, 1943
50 Barrels (bulk) Willet, 2 year old whiskey
2,942.89
September 24, 1943
Bottling of bulk Willet in 812 1/2 cases, tax, storage, etc.
14,469.30
November 1, 1943
50 Barrels of Brookford (bulk), 2 year old Bourbon
2,933.59
December 1, 1943
Bottling of bulk Brookford in 811 cases, tax, storage, etc.
15,098.63
The two orders of bulk whiskey in barrels were bottled and shipped to Morrissey Liquor Dealers in case lots at an added charge for handling and bottling. All of these sales were invoiced to Morrissey Liquor Dealers. To the invoices were attached bills of lading and sight drafts, all of which were accepted and paid in due course by Morrissey Liquor Dealers. The invoices accurately set forth in detail the terms of the various transactions, *100 and the prices charged in each instance were at the maximum ceiling prices allowable under the applicable O.P.A. regulations. By means of independent transactions these stocks of liquor were sold by Morrissey Liquor Dealers, at a small profit, to Delta Distributing Company, and picked up by the latter's trucks. [2]
In connection with the original sales, petitioner dealt with Castleman in the belief that the latter acted for and on behalf of Morrissey Liquor Dealers whose agent Castleman had represented himself to be. Petitioner received as commissions, on account of the foregoing sales, the total sum of $3,111.00 based on the rate of one dollar per case delivered, which commissions were paid to petitioner by checks signed by the executrix of the Estate of T. M. Morrissey, which estate acquired ownership of Morrissey Liquor Dealers at the death of Captain Tom Morrissey. Petitioner did not receive from Steve Castleman or any other person, in connection with the aforementioned *101 sales, during 1943, the sum of $72,370, nor any part thereof. The petitioner, Herman Leiser, was an established businessman of the New Orleans area for over 25 years, and bore an excellent reputation for truth and veracity in that area. From the time when he was first questioned by representatives of the Alcohol Tax Unit up to and including formal hearing of this matter, he displayed a high degree of co-operation. He made his books available for inspection, he answered questions under oath, he made a statement of net worth under oath, and he ultimately permitted inspection of the contents of his safety deposit boxes, although when the request to examine the contents of the box in New Orleans was originally made of him, he refused on advice of his accountant, Harang. Between the date of this original request and the actual inspection by Alcohol Tax Unit investigators Leiser went to this box and withdrew two articles of jewelry belonging to his wife. The petitioner, Herman Leiser, did not receive the alleged payments from Castleman in the total sum of $72,370.00. He did not understate any of his income for 1943 in his return with fraudulent intent to evade tax. No part of the deficiency *102 due from Herman Leiser for the year 1943 was due to fraud with intent to evade tax. Opinion The chief question in this proceeding is whether the petitioner, Herman Leiser, received income during 1943 consisting of alleged payments of black market fees from Castleman over and above the legitimate sales commissions which he reported in the returns of himself and his wife for 1943. It is alleged by the respondent, and he has so determined, that the petitioner received from Castleman black market "commissions" in the aggregate sum of $72,370 in connection with sales of whiskey and other liquor. If the petitioner received all or part of the payments which it is alleged were paid to him by Castleman during 1943, there results a deficiency in taxes for that year, and the question arises whether any part of such deficiency is due to fraud with intent to evade tax. The respondent has the burden of proof under the fraud issue, section 1112, Internal Revenue Code. Under the issue relating to the correct amount of petitioner's gross income for 1943, the burden of proof is upon the petitioner, Rule 32, Rules of Practice of this Court. But in this proceeding, the question *103 of fraud is so intertwined with the alleged receipt of payments by Castleman that the respondent's burden necessarily involves proof that Leiser received all or part of the alleged payments of $72,370. Fraud must be established by clear and convincing proof, and a mere preponderance of evidence does not discharge this burden. Griffiths v. Commissioner, 50 Fed. (2d) 782 (C.A. 7 1931); L. Schepp Co., 25 B.T.A. 419; Frank A. Maddas, 40 B.T.A. 572, aff'd 114 Fed. (2d) 548 (C.A. 3 1940); Henry S. Kerbaugh, 29 B.T.A. 1014, aff'd 74 Fed. (2d) 749 (C.A. 1 1935); L. A. Meraux, 38 B.T.A. 200. Undisputed evidence establishes the fact that in 1943 the petitioner, acting in the capacity of manufacturer's representative, [3] procured the sales and arranged for the delivery of specific quantities of liquor from Pebbleford Distillery of Wilder, Kentucky, to Morrissey Liquor Dealers, wholesale distributors located in Delta Point, Louisiana. There is documentary evidence [4] in this proceeding *104 which establishes, prima facie at least, that these sales were made at lawful O.P.A. ceiling prices. However, the Commissioner relying chiefly upon the testimony of Steve Castleman, contends that things are not what they seem to be, and that the true facts are: First, that by prearrangement Morrissey Liquor Dealers acted merely as a conduit for the sale and ultimate delivery of the stocks of whiskey to Delta Distributing Company in Vicksburg, Mississippi. Secondly, that Castleman, acting for Delta, was required to and did pay "premiums" [5] to Leiser aggregating $72,370, in cash, as a condition precedent to the acquisition of the whiskey by Delta. Third, that the aforementioned premiums, representing O.P.A. overcharges, were fraudulently omitted by the petitioner from his income tax return for 1943. Petitioner in his pleadings has categorically denied these allegations, and in his sworn testimony has affirmatively asserted, that all *105 income realized by him in 1943 in connection with the sales of whiskey from Pebbleford to Morrissey Liquor Dealers was in the form of commissions, paid at lawful rates, and was accurately reported in his income tax return for that year. The sworn testimony of Castleman, on the other hand, depicts five meetings between himself and Leiser, no other persons being present, at each of which times he states that he paid various sums in cash to Leiser totalling $72,370. In resolving the issues presented, this Court must be guided by the rules relating to burden of proof as stated above; but, also, and in the final analysis, it amounts to this, we must determine from all of the evidence in this proceeding, who, as between Leiser and Castleman, has related the true facts, and who has not, for obviously, truth is essentially absent from the testimony of either one or the other. The Court had the opportunity of observing both Leiser and Castleman as each gave his testimony under direct and cross-examination during the trial of this proceeding. The Court carefully observed each. Leiser's testimony is consistent, direct, and unequivocal. Castleman's testimony is contradictory in many instances, *106 and during the course of the trial, upon cross-examination and upon being confronted with examples of previous sworn statements which either varied in detail from his sworn testimony before this Court, or were inconsistent therewith, or contained discrepancies, Castleman admitted that he had been "mistaken" in some of his testimony. The record discloses, for example, that in January, 1944, Castleman made a written statement under oath to agents of the Alcohol Tax Unit in which he described his alleged payments of black market money to Leiser. Nowhere in this statement did Castleman mention the alleged fact that 20 bills in denominations of one thousand dollars each had been paid by him to Leiser in New Orleans. On the contrary, according to this 1944 statement of Castleman, all alleged payments to Leiser were made in Cincinnati, the first taking place in August, 1943. However, in September, 1949, when his deposition [6] was taken, and during the trial of this proceeding in April, 1950, Castleman testified, with great detail, that he had made his first payment to Leiser in New Orleans on July 28, 1943, consisting of 20 bills in denominations of one thousand dollars each. Thus, Castleman's *107 testimony presents not only inconsistency in this instance, but such tardy reference to details of importance that doubt is created about the veracity of details belatedly mentioned in the series of statements he has given. The uncontradicted evidence does show that on July 27, 1943, Castleman obtained from a bank in Vicksburg currency consisting of 20 bills of one thousand dollars denomination, which evidence was adduced by the respondent in attempted corroboration of Castleman's testimony that in order to obtain liquor inventories be paid $20,000 in excess of the legitimate commissions to which Leiser was entitled. But there is no evidence apart from Castleman's testimony that the foregoing amount of money was received by Leiser, and the weight to be given this item of evidence is affected by the credibility of all of Castleman's testimony. Respondent also called as witnesses two investigators of the Alcohol Tax Unit, Pace *108 and Everett, who testified that Castleman had stated to them that he had paid Leiser $72,370 in "premiums." In making these statements to Pace and Everett, Castleman was seeking to justify his failure to include in his tax returns the amount of income which he admitted collecting in overceiling prices from his customers. He also showed the investigators pencilled notations on the backs of certain invoices, representing to them that the notations were a record of premiums paid to Leiser, although the name of Leiser nowhere appeared thereon. Not only did Castleman fail to produce these invoices with the purported notations at the trial, claiming to have destroyed them, but even had he done so, they would have been self-serving declarations which in no way related to Leiser without Castleman's oral explanation of their alleged significance, namely, that the notations of figures represented payments to Leiser. Consequently, neither the statements of Castleman to Everett and Pace nor the pencil notations on invoices were actually corroborative of Castleman's testimony. See IV Wigmore on Evidence (3d ed. 1940), §§ 1124, 1126, and 1127. We recognize the general rule that evidence of improper *109 conduct in collateral matters is inadmissible for the purpose of impeaching the credibility of a witness. However, the details of Castleman's unlawful activities and immoral conduct as set forth under our Findings of Fact were pertinent and material to the issues in this case, and evidence with respect thereto was therefore admitted properly. For example, it was incumbent upon Castleman to point out that Mississippi was a dry state and that he lacked the necessary Federal basic permit to sell liquor in order to explain to this Court the necessity for his arranging to receive liquor shipments from Louisiana through Morrissey Liquor Dealers. Castleman's preliminary testimony in this proceeding revealed that he had made extensive black market sales and showed that it was while being investigated for such activity that he first made his claim of having paid overceiling commission money to Leiser. In spite of a continuing effort on the part of Castleman to conceal from the Bureau of Internal Revenue and this Court [7] both the true nature of his business relationship with Mike Morrissey during 1943 and 1944, and the total gross income earned by them as partners in the Delta Distributing *110 Company, it conclusively appears that Castleman substantially understated his true gross income for those years on the tax returns which he signed under penalty of perjury and filed with the Bureau. In the same connection it has been established by the evidence that Castleman, in collusion with Mike Morrissey, reported as his own, income which should lawfully have been reported by Morrissey. The inescapable inference is that this was done in order to effect a substantial tax saving for Mike Morrissey whose income for 1943 and 1944, exclusive of his share of the net income of Delta, was already taxable at high rates of tax. Cross-examination of Castleman with respect to his income tax returns was permitted properly by the Court, since it not only related to the credibility of his direct testimony about his business relationship with Mike Morrissey, but also established interest on the part of Castleman which was prejudicial to petitioner. The petitioner contends, in defense of Castleman's charges, *111 that Castleman had a motive in seeking to establish that he was "obliged" to pay $72,370 in black market premiums to Leiser, which motive was Castleman's purported belief as evidenced by his own testimony, that his having been "obliged" to make such alleged payments to Leiser, excused his failure to report on his own return an equal amount of income, which he admittedly collected from or, as he put it, "passed on to" his own customers, in the form of O.P.A. overcharges. While this Court has not had to rely too heavily upon these various examples of illegal conduct on the part of Castleman, in evaluating his credibility, particularly in light of the many contradictions and discrepancies in the testimony given by him in this proceeding, we do not believe it would have been error had we done so. In Frank A. Maddas, supra, one of the witnesses relied upon by respondent to establish the alleged fraud of Maddas, was one Sunder who "was confessedly engaged in the illegal liquor traffic" and "was an extortioner." Petitioner in that case urged this Court to disregard the testimony of Sunder on the grounds of his misconduct alone. We said, at page 579 of that opinion: "If *112 Sunder's testimony stood alone, we think there would be great force in petitioner's argument, but it does not stand alone. There is much evidence in the record to corroborate it." In this proceeding there is no evidence corroborating Castleman's claim, made in his testimony, of having paid $72,370, or less, to petitioner. On the other hand we find that the petitioner, Herman Leiser, was a credible witness. In testifying consistently that he never received the alleged black market payments from Castleman, Leiser is supported not only by his own records of account, but by sales invoices which show the transactions in question to be exactly in accord with his testimony and his records. In addition, we are impressed by the fact that there was adduced on behalf of Leiser, the oral testimony of five witnesses representing, in our opinion, a fair cross-section of the community in which he lived and did business, who stated unequivocally that the reputation which Leister bore for truth and veracity was excellent. In contrast with the altogether reprehensible record of indifference to the law borne by Castleman, as described above, there does not appear in the record of this proceeding, *113 aside from the charges to be found in Castleman's testimony, one scintilla of evidence showing that Leiser has at any time been at odds with the law either through violations of O.P.A. Maximum Price Regulations, or in any other respect. In short, the respondent has offered no evidence whatsoever in contravention of that offered by Leiser for the purpose of establishing his reputation for truth and veracity. The respondent's attempt to establish the receipt by Leiser of the sum of $72,370 on the basis of Leiser's increase in net worth failed of proof. Leiser satisfactorily showed that the increase in his net worth between December 31, 1942 and December 31, 1944, was accounted for by his reported net income for 1943 and 1944, less taxes paid, and living expenses which were reasonable for a man of his circumstances and position. We are not unmindful, in this connection, of the fact that Leiser visited his safety deposit box on one occasion before permitting inspection of its contents by Alcohol Tax Unit investigators. However, aside from Leiser's explanation, there is no evidence as to what he may or may not have withdrawn at the time. While this circumstance gives rise to suspicion *114 and to a variety of inferences, mere suspicion is insufficient proof of fraud. Sharpsville Boiler Works, Co., 3 B.T.A. 568; Nicholas Roerich, 38 B.T.A. 567, aff'd 115 Fed. (2d) 39. Upon careful review and consideration of all of the evidence, it is found as a fact that the petitioner, Herman Leiser, did not receive the alleged sum of $72,370, or any part thereof, from Steve Castleman. The deficiency to which the respondent has added the 50 percent fraud penalty resulted from the respondent's inclusion in the income of Herman Leiser of one-half of $72,370. Since the fraud determination falls for want of a sound basis, the tax deficiencies resulting from the alleged, unreported income fall also, and the fraud penalty asserted against Herman Leiser, also, falls. Section 293(b), Internal Revenue Code. Accordingly, it is held that the respondent erred in including $72,370 in the income of the petitioners, and in imposing the 50 percent penalty in the proceeding of Herman Leiser. The petitioners concede that the respondent properly disallowed a deduction of $589.17, and that two items - $386.42 and $1,786.86 - are properly *115 includible in income. These adjustments are not involved in the respondent's determination of the 50 percent fraud penalty, and the evidence does not establish that the errors in the return of Leiser with respect thereto were due to fraud with intent to evade tax. The admitted adjustments necessitate recomputations under Rule 50 which will result in small deficiencies. No part of such deficiencies is due to fraud. Decisions will be entered under Rule 50. Footnotes
1. We have not judicially noticed the proceedings of Mike Morrissey in this Court which have been settled except to the extent of certified portions of the record in proceedings of Morrissey and of Castleman which were received in evidence in this proceeding. See B. F. Edwards, 39 B.T.A. 735↩.
2. Delta Point, Louisiana and Vicksburg, Mississippi, located on opposite banks of the Mississippi River, are connected by a bridge which renders access from the "wet" state to the "dry" state a simple matter.↩
3. Herman Leiser was variously referred to in the testimony as distiller's agent, liquor salesman and liquor broker.↩
4. The invoices referred to under Findings of Fact, supra. ↩
5. The alleged receipt by Leiser of $72,370 in 1943 has been referred to in the record variously as "black market money," "O.P.A. overcharges," "overages," and "over-the-ceiling money."↩
6. While some argument was made at the trial respecting the admissibility of Castleman's deposition, when it was finally offered by petitioner, counsel for respondent consented to, and in fact urged its receiption and full consideration by the Court.↩
7. As evidenced by his refusal to testify when his deposition was being taken on the grounds that to do so would incriminate him, and, also, by his contradictory testimony at the trial.↩